# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | Criminal No. 07-8(4) (JNE-JJG) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **James Charles Weekly,** | |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

The above-entitled matter came before the undersigned on May 22, 2007, for resolution of pretrial motions. W. Anders Folk, Assistant United States Attorney, appeared for the Government. Kevin M. O'Brien, Esq., appeared on behalf of defendant Charles Weekly. Dispositive motions are addressed in this report and recommendation; all other motions are addressed in a separate order.

By a motion to suppress evidence from a search and seizure (Doc. No. 106), Mr. Weekly asserts that officers improperly extended the duration of an investigatory stop; that they improperly acquired consent to search his vehicle; and that their search and seizure was motivated by racial discrimination. By a motion to suppress statements (Doc. No. 107), Mr. Weekly argues that officers' questioning on the scene of the investigatory stop violated his privilege against self-incrimination. And through a motion for a *Franks* hearing (Doc. No. 116), Mr. Weekly contends there is cause to believe that allegations in a search warrant affidavit are false, and he asks for a hearing on this issue.

This case is scheduled to be tried before U.S. District Court Judge Joan N. Ericksen and has been referred to this Court for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The events and analysis relevant to the dispositive motions are as follows.

## I. BACKGROUND

Around midday on March 21, 2006, Trooper Lawrence Brown of the Wisconsin State Patrol was in his marked squad on the median of Interstate 94, using a radar gun to check for speeders in the westbound lanes. According to Brown, a 1992 Chevrolet Caprice came around a curve in the freeway, about 1400 feet away. Brown checked the speed of the Caprice and found it was traveling seventy-two miles per hour, in excess of the posted speed limit of sixty-five miles per hour.

The Caprice passed by where Brown was parked on the median. Brown claims that he could not see the driver of the Caprice as it approached and passed. Photographs of the Caprice show that its side windows, but not its windshield, were tinted. Brown pulled into traffic and pursued the Caprice. It took about two minutes for Brown to catch up. Brown then activated his emergency lights and the Caprice pulled over without incident.

His use of the lights also activated an in-squad video camera, which recorded many of the ensuing events. Parts of this recording lack audio, which was activated only at times when Brown toggled a remote switch on his uniform.

Brown exited his squad and approached the Caprice on the passenger side. Its driver and sole occupant, later identified as the defendant, James Weekly, rolled down the passenger-side window. Brown informed Weekly that he was stopped for speeding, requesting his drivers license, vehicle registration, and proof of insurance. Weekly complied, explaining that the vehicle was not his but his cousin's.

While he made this request, Brown observed tiny stems and flakes of a green herbaceous substance on the passenger seat and in the ashtray. This substance is shown in some photographs of the

interior of the Caprice. In addition, Brown saw and smelled a roll of fabric softener tissues in the back seat, even though there was no laundry. From his training, Brown believed that the green substance was marijuana and that the fabric softener was intended to mask its scent. Brown also noticed that Weekly was avoiding eye contact and that his pulse was rapid. From these facts, Brown suspected that Weekly had more marijuana in the Caprice.

With the documents he obtained from Weekly, Brown returned to his squad. He checked the drivers license, which was valid, and learned that the vehicle was registered to Weekly. Brown also called for backup. According to Brown, he had resolved to search the Caprice, on his suspicion that there was marijuana.

Brown went back to the Caprice. After directing Weekly to exit his vehicle, Brown returned the drivers license and the documents. Brown explained he was not citing Weekly for speeding and was only giving him a warning. Brown then started to walk back towards his squad, but before they reentered their vehicles, he turned and spoke to Weekly. Their conversation was captured by the video recording as follows.

> Brown: Mr. Weekly, can I ask you a question?
>
> Weekly: What's that?
>
> B: Looks like someone was rolling a blunt and there's weed all over the carpet in there. Do you know anything about that?
>
> W: I'm going to vacuum it [inaudible]. My cousin left in the car [inaudible].
>
> B: So it doesn't surprise you that there's weed on the floor.

| | |
|---|---|
| W: | I meant to vacuum the car out, but you know. |
| B: | Okay, whose weed was it? |
| W: | It was my cousin's. Her birthday was the other day, so she had a little. |
| B: | She smoked a blunt on her birthday. |
| W: | Okay. |
| B: | Okay with you if I check the vehicle for drugs? |
| W: | I'm kind of in a rush [inaudible], but if you wanted to. |
| B: | I do want to and I intend to search the vehicle. Is that all right with you? |
| W: | I was kind of in a rush, but if you wanted to, then you know. |
| B: | I do want to. |
| W: | Go ahead sir, go right ahead. |

Brown produced a consent form and continued.

| | |
|---|---|
| B: | This is a consent to search form indicating that I asked, you gave me permission. I didn't threaten you, coerce you, hit you with a big stick, call you names, or anything like that. Sign that right there please. |
| W: | All right. |

Throughout this conversation, Brown acted in a manner that was polite and nonthreatening. Weekly signed the form without further comment.

At that point, Brown conducted a pat-down search of Weekly, and then directed him to stay by the front of the squad car. After another officer arrived, Brown began to search the Caprice. He noted

that the rear drivers-side door was unusually heavy and that its window did not roll down as far as expected. He also observed that the interior fixture on the door was pried loose.

Based on his past experience, Brown believed that contraband might be concealed inside the door. He shone a flashlight behind the interior fixture and saw a package tightly wrapped in plastic. Brown concluded that the package held cocaine.

During this search, Weekly was sitting on the front bumper of the squad car. After Brown made his discovery, he ordered Weekly to the ground at gunpoint. The video recording shows that Weekly had nothing in his hands. Although the front of the squad obscures where Weekly lay down, the video recording suggests that he placed both his hands on the ground as he was laying down. Brown then directed the assisting officer to place Weekly in handcuffs.

While the assisting officer was restraining Weekly, Brown said, "Okay, he's on the phone. Put the phone down." The video recording shows that Brown took a telephone and placed it on the trunk of the Caprice. Once again, because the front of the squad obscures where Weekly lay down, it is not possible to tell where the telephone was found.

When Brown testified at the motion hearing, he said Weekly was shouting into his telephone at the time of his arrest. But it is difficult to determine from the video recording whether he was shouting. Instead, it appears that he was ordered to the ground; that he placed his hands on the ground; and that he was restrained almost immediately thereafter.

Several more officers arrived afterwards. For much of the remaining video recording, the audio was not recorded. However, Brown made three brief statements about the telephone that he did record. To a dispatcher he said, "After I [found the drugs], the suspect was on the cell phone, I confiscated the cell

5

phone[.]" He then told the officer who assisted with the arrest that Weekly "was making a distress call on his cell phone[.]" And when other officers arrived on the scene, Brown said, "I didn't know [Weekly] was on the phone, calling for help."

Investigator Cindy Borgschadtz, of the St. Croix County Sheriff's Department, prepared an application for a search warrant later that day. In the supporting affidavit, she noted that Weekly had been arrested after four kilograms of cocaine were found in his possession. She added,

> Just prior to Trooper Brown placing him under arrest, James Weekly used his . . . cell phone and made contact with an unknown person telling them of the arrest.
>
> Your affiant believes that James Weekly may have been using his cell phone in commission of the crime of drug trafficking.

Based on this information, a magistrate granted a search warrant that authorized a seizure of the cell phone and a search of its memory for incriminating records. The warrant was executed and several telephone numbers were recovered.

### B.   ANALYSIS

#### 1.   Search and Seizure

##### a.   Duration of Investigatory Stop

The parties have not contested that, because Weekly committed a traffic violation, Brown had reasonable, articulable suspicion to make an investigatory stop. *Cf. United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004). The Fourth Amendment requires, however, that such stops be limited in scope, meaning the investigation is ordinarily related to the circumstances that justified the stop. *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007). Weekly thus argues that, once Brown completed his

6

investigation of the speeding offense and issued the warning, further detention was illegal.

In the context of a traffic stop, if circumstances give rise to reasonable, articulable suspicion of some unrelated offense, then an officer may broaden the scope of the investigation. *United States v. Lyons*, — F.3d —, 2007 WL 1427036 at *3 (8th Cir. 2007). Such an unrelated suspicion may arise, for example, where an officer has a reasonable, articulable suspicion that the vehicle contains contraband. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).

If an officer has objective reason to believe marijuana was used in a vehicle, and the vehicle contains a masking agent that may hide the odor of contraband, the officer has reasonable, articulable suspicion to proceed with an investigation unrelated to the original traffic stop. *See, e.g., United States v. McCoy*, 200 F.3d 582, 583 (8th Cir. 2000) (per curiam) (noting that officer smelled burnt marijuana and air freshener).

Brown observed particles of marijuana in the Caprice. He saw and smelled fabric softener, without any accompanying laundry, and he inferred it might be used to mask the scent of contraband. These circumstances provided Brown with reasonable, articulable suspicion to investigate whether there were illegal drugs in the Caprice, notwithstanding the prior speeding offense. His decision to extend the duration of the stop was permitted under the Fourth Amendment.

      **b.**    **Consent Search**

Weekly argues that, because the investigatory stop had ended and his ensuing detention was illegal, he could not validly consent to a search of his vehicle. As the previous analysis has shown, at the time he gave consent, he was lawfully subject to an investigatory stop. Weekly's continued detention, therefore, did not taint his consent.

Assuming for the sake of argument that his continued detention was illegal, this scenario has frequently been examined by the Eighth Circuit. It examines several concerns when determining whether, during an illegal seizure, a defendant has nevertheless given valid consent to a search of his person or possessions. *United States v. Perry*, 437 F.3d 782, 785 (8th Cir. 2006); *United States v. Urbina*, 431 F.3d 305, 309 (8th Cir. 2005). But where an officer briefly but improperly extends the scope of a traffic stop, and an otherwise valid consent search takes place, the fruits of the search are usually admissible. *See United States v. Yang*, 345 F.3d 650, 654-55 (8th Cir. 2003); *United States v. Beatty*, 170 F.3d 811 (8th Cir. 1999).

Even if Brown improperly extended the duration of the stop, his request to search occurred only moments after the stop ended. And there is no indication that Weekly gave his consent due to coercion or any other improper police conduct. The encounter was open and voluntary. Evidence from the ensuing search, therefore, need not be suppressed.

The Government argues that, even assuming Weekly did not consent to the search, Brown had probable cause to do so. Although the Fourth Amendment ordinarily requires a warrant before a search, under the so-called automobile exception, officers may search a motor vehicle without a warrant on probable cause that it contains contraband. When determining probable cause in this context, the inquiry is whether there is a fair probability that evidence of a crime will be found in a particular place. *United States v. Valle Cruz*, 452 F.3d 698, 702-03 (8th Cir. 2006).

Where the circumstances indicate the presence of illegal drugs in a vehicle, there is sufficient evidence of a crime to establish probable cause for a search that vehicle. *See, e.g., United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005) (upholding search where drug dog alerted to illegal drugs in

8

a vehicle); *United States v. Rowland*, 341 F.3d 774, 784-85 (8th Cir. 2003) (holding that where illegal drug paraphernalia was plainly visible in vehicle, officer had probable cause to search for other illegal drugs in vehicle).

The record here shows that, before searching the Caprice, Brown observed marijuana inside. When Brown further inquired, Weekly admitted the substance was marijuana, and instead denied that the Caprice was his. This denial supports even further suspicion of a crime because the Caprice was registered to Weekly. Under these circumstances, there was a fair probability that evidence of a crime would be found in the Caprice. The search was supported by probable cause, and therefore, it was permitted under the automobile exception.

### c.     Race Discrimination

In his remaining challenge to his seizure and the search of the Caprice, Weekly argues that Brown stopped him because he was black. This argument, which is founded on improper, selective law enforcement for reasons of race, is correctly presented under the Equal Protection Clause of the Fourteenth Amendment rather than the Fourth Amendment. *See United States v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005).

There are two ways a defendant may show a police encounter is improperly motivated by race in violation of the Equal Protection Clause. One is by demonstrating that officers intended direct discrimination, targeting the defendant solely for reasons of race. The other is by demonstrating that those of other races, in circumstances similar to that of the defendant, do not receive similar law scrutiny. *Compare Johnson v. Crooks*, 326 F.3d 995, 999-1000 (8th Cir. 2000) (disparate treatment) *with Frazier*, 408 F.3d at 1108 (discriminatory animus).

Weekly has not shown that he was stopped because of his race. Although he characterizes Brown's testimony in this manner, nothing in the record suggests that Brown considered race before initiating the stop, or even that Brown knew Weekly's race at the time. Nor has Weekly shown that other non-black motorists, in similar circumstances, were being overlooked. He has not shown that the stop involved racially discriminatory conduct in violation of the Equal Protection Clause. So evidence from the stop need not be suppressed for this reason.

### 2.   Statements

Weekly next asserts that his statements to Brown were taken in violation of his privilege against self-incrimination. He primarily argues that he was in custody during the investigatory stop, and therefore, he should have received a *Miranda* warning prior to questioning.

The Fifth Amendment privilege against self-incrimination protects criminally accused from being subject to questioning without assistance of counsel. When determining whether a statement violates the privilege against self-incrimination, the threshold issues are whether the defendant is in custody, and if so, whether officers interrogated the defendant without an advance *Miranda* warning. *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005).

The critical issue in this matter is whether Weekly was in custody at the time his statements were taken. A defendant is in custody when that defendant is formally arrested or is restrained to a degree comparable to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). To determine whether restraint is comparable to formal arrest, the inquiry is whether a reasonable person, under similar circumstances, would have understood the situation to be an arrest. *United States v. Martinez*, 462 F.3d 903, 908-09 (8th Cir. 2006).

Although several factors may influence whether a particular police encounter is equivalent to arrest, *United States v. Black Bear*, 422 F.3d 658, 662-63 (8th Cir. 2005), the principal concern is whether the defendant would be able to depart the scene, *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004). But as the Supreme Court ruled in *Berkemer v. McCarty*, where a motorist is detained pursuant to an ordinary vehicular stop, the level of restraint is not sufficient to reach that of formal custody. 468 U.S. 420, 440 (1984).

Further restraint, such as the use of handcuffs, may signal that a traffic stop has transformed into a formal arrest. *See Martinez*, 462 F.3d at 909. But otherwise the Eighth Circuit consistently holds, in accordance with *Berkemer,* that an ordinary investigatory stop is not equivalent to formal custody. The privilege against self-incrimination does not attach, and an officer is not required to give a *Miranda* warning before questioning. *See, e.g., United States v. Moore*, 98 F.3d 347, 351 (8th Cir. 1996); *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995).

Weekly was detained here for an investigatory stop. At the time Brown was asking Weekly questions, the level of restraint was no greater than that for an ordinary traffic stop, and it was far less than that associated with formal arrest. As the video recording shows, Weekly was not subject to any coercion or duress, and there was no indication he was subject to further restraints. For these reasons, he was not in custody at the time of questioning and the privilege against self-incrimination did not attach. Thus, no *Miranda* warning was needed and his statements need not be suppressed.

    **3.**     *Franks* **Hearing**

Weekly challenges the affidavit supporting the search warrant executed for his telephone. He argues that a hearing is required to determine whether the allegations in the affidavit are truthful. In support

11

of this argument, he notes that according to Brown, Weekly was using his telephone at the time of his arrest. But this account is evidently contradicted by the video recording, which fails to show that Weekly used his telephone.

As a rule, the facts in a search warrant affidavit are presumed to be true. To obtain a hearing on the truthfulness of facts in a search warrant affidavit, a defendant is required to specifically point out which portions of the affidavit are false and why. The defendant must also support this argument with an offer of proof. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Although the defendant is not required to present clear proof of a falsehood, there must be at least a "substantial preliminary showing" to that effect. *United States v. Williams*, 477 F.3d 554, 557-58 (8th Cir. 2007). A court has discretion to decide whether to conduct a hearing. *United States v. Carpenter*, 422 F.3d 738, 745 (8th Cir. 2005).

Relying on information from Brown, Borgschadtz alleges Weekly was using his telephone immediately before his arrest. But the video recording does not clearly show that Weekly either had the telephone in his hands or used it, and his voice cannot be heard on the audio, talking on the telephone or otherwise. Although the Government argues to the contrary, this record provides substantial grounds for a hearing into the truthfulness of the affidavit. Assuming that this recommendation is adopted, this Court defers to the District Court on whether the hearing should be heard before this Court.

At this time, this Court expresses no opinion regarding whether the affidavit is accurate, which is a close question, or whether the fact that Weekly used the telephone is relevant to probable cause. Due to the position of the camera, not all of the action prior to the arrest is visible on the video recording, and additional testimony may explain what happened. Further insight may be provided by the call records on the telephone itself, which presumably show whether Weekly completed a telephone call immediately

before his arrest.[1]  A hearing would provide an appropriate forum to consider these concerns.

The Government has also noted that the motion for a hearing was untimely.  But Weekly did not receive the video recording until the day of the motion hearing, a week after motions were due.  Nor did he have an opportunity to hear testimony from Brown.  Given the state of the record, Weekly had reason to file his motion late.  There is no unfair prejudice to the Government, and given the concerns about the truthfulness of the affidavit, it is appropriate to go ahead with a hearing.

Weekly raises one other argument.  In the affidavit, Borgschadtz alleges that Weekly was found "in possession" of approximately four kilograms of cocaine.  Weekly contends this claim is untrue, asserting that the cocaine was simply found in a rear door of his vehicle.  The Government counters it was reasonable to allege that Weekly possessed the cocaine.

The Government correctly states that the allegations in a search warrant affidavit should be read in a common-sense, nontechnical manner.  *See United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).  Notwithstanding a precise legal definition of possession, the circumstances provide ample basis to claim that Weekly possessed the contraband in his vehicle.  For the purposes of the analysis here, there is no substantial preliminary showing that this allegation was false.  No hearing is required on this question.

## III.   CONCLUSION

When Weekly was stopped for a traffic offense, officers developed articulable, reasonable suspicion that he committed a drug offense.  For this reason, it was reasonable for officers to further extend

---

[1] In the search warrant return, Borgschatdz states that she accessed the menu for outgoing calls from the telephone, and she lists names of those called.  However, the return does not state when these calls were placed.

the duration of the stop. The stop did not ripen into an improper seizure, nor did it taint his subsequent consent to a search of his vehicle. Even if the consent was ineffective, officers also had probable cause to conduct the search. The search and seizure, moreover, was not the product of improper race discrimination. This Court concludes that the motion to suppress evidence from a search and seizure should be denied.

When Brown questioned Weekly, he was only subject to an investigatory stop and had no further restraints. Weekly was not in custody, so his privilege against self-incrimination had not attached, and no *Miranda* warning was required. Because his statements were not taken in violation of his privilege against self-incrimination, this Court also concludes that the motion to suppress statements should be denied.

Weekly has made a substantial preliminary showing that an allegation in the search warrant affidavit is untrue. For this reason, this Court concludes that the motion for a *Franks* hearing should be granted.

## IV.     RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Mr. Weekly's motion to suppress evidence from a search and seizure (Doc. No. 106) be **DENIED.**

2. Mr. Weekly's motion to suppress statements (Doc. No. 107) be **DENIED.**

3. Mr. Weekly's motion for a *Franks* hearing (Doc. No. 116) be **GRANTED.**

4. Should the district court affirm the ruling of this Court on the motion for a *Franks* hearing, the District Court determine whether the hearing should be heard before it or before this Court, after which a notice of hearing shall issue.

Dated this 12th day of June, 2007.                    s/Jeanne J. Graham

                                                  JEANNE J. GRAHAM
                                                  United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by July 2, 2007. A party may respond to the objections within ten days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.